ROSENBAUM, Circuit Judge,
concurring.
I concur in the Majority’s opinion. I write separately, though, because, like the Dissent, I think that the third-party doctrine,[1] as it relates to modern technology, warrants additional consideration and discussion. I view the third-party doctrine as applying in this case because Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), implicitly found no historical expectation of privacy implicated by the information that we give to a service provider for the purpose of making a telephone call other than the expectation of privacy that we generally do not have in information that we voluntarily convey to a third party. Since, like Smith, this case involves information that we knowingly expose to a service provider for the purpose of making a telephone call and no more specific historically recognized privacy interest is implicated by cell-site location information, this case is necessarily controlled by Smith.
But when, historically, we have a more specific expectation of privacy in a particular type of information, the more specific privacy interest must govern the Fourth Amendment analysis, even though we have exposed the information at issue to a third party by using technology to give, receive, obtain, or otherwise use the protected information. In other words, our historical expectations of privacy do not change or somehow weaken simply because we now happen to use modern technology to en *525 gage in activities in which we have historically maintained protected privacy interests. Neither can the protections of the Fourth Amendment. See Kyllo v. United States, 533 U.S. 27, 34, 121 S.Ct. 2038, 2043, 150 L.Ed.2d 94 (2001) (“To withdraw protection of this minimum expectation [of privacy] would be to permit ..-. technology to erode the privacy guaranteed by the Fourth Amendment.”). So reliance on the third-party doctrine must be limited to those cases involving alleged privacy interests that do not implicate a more specific historically recognized reasonable privacy interest.
I.
Before exploring why this is so, I pause to express my view that the Dissent is right to raise its concerns. In our time, unless a person is willing to live “off the grid,” it is nearly impossible to avoid disclosing the most personal of information to third-party service providers on a constant basis, just to navigate daily life. And the thought that the government should be able to access such information without the basic protection that a warrant offers is nothing less than chilling. Today’s world, with its total integration of third-party-provided technological services into everyday life, presents a steroidal version of the problems that Justices Marshall and Brennan envisioned when they dissented in United States v. Miller, 425 U.S. 435, 447, 454, 96 S.Ct. 1619, 1626, 1629, 48 L.Ed.2d 71 (1976) (Brennan, J., and Marshall, J., dissenting, respectively), and its progeny, including Smith v. Maryland, 442 U.S. 735, 748, 99 S.Ct. 2577, 2584, 61 L.Ed.2d 220 (1979) (Marshall, J., dissenting). As Justice Marshall aptly explained the problem, under the third-party doctrine, “unless a person is prepared to forgo use of what for many has become a personal or professional necessity, he cannot help but accept the risk of surveillance.” Smith, 442 U.S. at 750, 99 S.Ct. 2577, 2585, 61 L.Ed.2d 220 (Marshall, J., dissenting). Perhaps it was this type of realization that caused Justice Sotomayor to write, “[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.” United States v. Jones, — U.S.-, 132 S.Ct. 945, 957, 181 L.Ed.2d 911 (Sotomayor, J., concurring). Since we are not the Supreme Court and the third-party doctrine continues to exist and to be good law at this time, though, we must apply the third-party doctrine where appropriate.
But, as the Dissent points out, the mere fact that the third-party doctrine could have been applied to an alleged privacy interest does not mean that it always has been. To ensure that this is a case where the third-party doctrine should be applied, I think it important to consider what sets apart those cases where the Supreme Court has chosen not to apply the third-party doctrine, despite the fact that a party has exposed its effects or information to a third party.
II.
The Supreme Court has explained that, in analyzing a Fourth Amendment claim, we begin by determining “whether the action was regarded as an unlawful search or seizure under the common law when the Amendment was framed.” Wyoming v. Houghton, 526 U.S. 295, 299, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408 (1999). We do this because, “[a]t bottom, we must ‘assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.’ ”[2] *527 United, States v. Jones, — U.S. ---, 132 S.Ct. 945, 950, 181 L.Ed.2d 911 (2012) (citation omitted). So it seems to me that existing Supreme Court precedent may fairly be construed to suggest that where society has historically recognized a legitimate expectation of privacy, we must continue to do so for purposes of Fourth Amendment analysis, even if, in our modern world, we must now expose to a third party information that we would have previously kept private, in order to continue to participate fully in society. If we do not, we will face the Hobson’s choice of leaving our historically recognized Fourth Amendment rights at the door of the modern world or finding ourselves locked out from it. That the Constitution will not abide.
A.
As the Dissent points out, the Supreme Court has held that “[a] hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office.” Hoffa v. United States, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); see also Minnesota v. Carter, 525 U.S. 83, 95-96, 119 S.Ct. 469, 476, 142 L.Ed.2d 373 (1998) (Scalia, J., concurring) (citing Oystead v. Shed, 13 Mass. 520 (1816), for the proposition that a trespass occurs when the sheriff breaks into a dwelling to capture a boarder living there); Minnesota v. Olson, 495 U.S. 91, 96-97, 110 S.Ct. 1684, 1688, 109 L.Ed.2d 85 (1990) (holding that overnight guests in the homes of a third person can have a reasonable expectation of privacy in those premises). This is so, even though housekeepers and maintenance people commonly have access to hotel rooms during a guest’s stay and can view and even move around a guest’s belongings in order to conduct their duties. But the fact that a hotel guest has exposed his or her belongings to hotel workers does not, in and of itself, entitle the government to enter a rented hotel room and conduct a warrant-less search.
Similarly, historically, human operators were known to eavesdrop on the contents of telephone calls in the early days of telephone usage. See Jeff Nilsson, What the Operators Overheard in 1907, The Saturday Evening Post, June 30, 2012, http:// www.saturdayeveningpost.com/2012/06/30/ history/post-perspeetive/operators-heard1907.html (last visited Apr. 16, 2015). And, as Justice Stewart observed, even after human operators were taken out of the equation, telephone conversations may have been “recorded or overheard by the use of other [telephone] company equipment.” Smith v. Maryland, 442 U.S. 735, 746, 99 S.Ct. 2577, 2583, 61 L.Ed.2d 220 (1979) (Stewart, J., dissenting). But the fact that, historically, we exposed our private conversations to third parties did not stop the Supreme Court from holding in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that we have a reasonable expectation of privacy in telephone communications and that the government generally must obtain a warrant before intercepting them.
Why should that be so when the third-party doctrine also speaks to what a reasonable expectation of - privacy is (none where it applies), and the doctrine seemingly applies to these situations? I believe that Supreme Court precedent fairly may be read to suggest that the third-party doctrine must be subordinate to expectations of privacy that society has historically recognized as reasonable. Indeed, our *528 privacy expectations in modern-day hotels and the content' of our telephone conversations hearken back to historically recognized reasonable expectations of privacy.
As Justice Scalia has explained, “The people’s protection against unreasonable search and seizure in their ‘houses’ was drawn from the English common-law maxim, ‘A man’s home is his castle.’ ” Carter, 525 U.S. at 95, 119 S.Ct. at 475 (Scalia, J., concurring) (emphasis omitted). And a person enjoys a recognized expectation of privacy in that home, provided he or she actually is living there. Id. at 95-96, 119 S.Ct. at 476. So, when a person rents and dwells in a hotel room,[3] that hotel room becomes that person’s “home” and “castle,” for purposes of the Fourth Amendment, regardless of who else may enter the premises.
As for the telephone, it, of course, was not invented until the late 1800’s and was not widely used until well after the Framers’ time.[4] Until then, people who were not closely located to each other typically communicated by letter. See, e.g., https:// jeffersonpapers.princeton.edu/ (last visited Apr. 16, 2015) (noting that Thomas Jefferson wrote and received letters). As the Supreme Court has noted, “Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy....” United States v. Jacobsen, 466 U.S. 109, 114, 104 S.Ct. 1652, 1657-58, 80 L.Ed.2d 85 (1984); see also Ex parte Jackson, 96 U.S. 727, 733, 6 Otto 727, 24 L.Ed. 877 (1877).
While the Supreme Court did not mention society’s reasonable expectation of privacy in the content of communications sent by letter through third parties when it found a reasonable expectation of privacy in the content of communications transmitted by telephone through third parties in Katz, it is clear that the historical expectation of privacy in communications by letter is the same expectation of privacy that we continue to have in communications that we conduct by telephone. And the fact that we have always had to rely on third parties to engage in telephone calls — even when the third parties were known to eavesdrop from time to time — does not somehow change our reasonable expectation of privacy in personal telephone calls. Put simply, the fact that we have changed the way that we conduct personal communications does not mean that we have altered our expectation of privacy in our personal communications.
B.
To help explain how the conflict between historically recognized privacy interests and the third-party doctrine plays out in light of modern technology — and why the cell-site location information at issue in this case is subject to the third-party doctrine — consider a few examples of historical privacy interests implicated by modern technology.
If our expectation of privacy in our personal communications has not changed from what it was when we only wrote letters to what it is now that we use telephones to conduct our personal interac *529 tions, it has not changed just because we now happen to use email to personally communicate.[5] See United States v. Warshak, 631 F.3d 266, 288 (6th Cir.2010). Just as the need to entrust third parties with our personal conversations when we communicate by written letter or by telephone does not affect the analysis, the need to rely on third parties to provide Internet service when we communicate by email cannot do so, either.
The same is true for our other historically recognized reasonable expectations of privacy. So, for instance, while the Internet and its search engines obviously did not exist in the 18th century, libraries did. See, e.g., http;//franklinma.virtualtownhall. net/Pages/FranklinMA_Library/ libraryhistory (last visited Apr. 13, 2015) (discussing the establishment of the Franklin Public Library in 1790). And, though libraries no doubt have always kept track of the books checked out, they have not monitored what a person reviews within the borrowed books, and library users have traditionally been free to anonymously peruse materials at the library without checking them out and creating a record. This anonymity is critical to First Amendment rights. See, e.g., United States v. Rumely, 345 U.S. 41, 57-58, 73 S.Ct. 543, 551-52, 97 L.Ed. 770 (1953) (Douglas, J., concurring) (“When the light of publicity may reach any student, any teacher, inquiry will be discouraged.... If [a reader] can be required to disclose what she read yesterday and what she will read tomorrow, fear will take the place of freedom in the libraries ... of the land”).
This privacy interest is no less important simply because many of us now use the Internet to do what we used to do at the library. We do not have lower expectations of privacy in what we research— particularly with respect to our expectations. that the government will not be looking over our shoulders to review our work — merely because we research and read it online at home or in a coffee shop instead of in hard copies of books and periodicals in the stacks of the library, even though the only way that we can conduct online research is through a third-party service provider. In short, the expectation of privacy in reading and researching what we want, free from govern *530 ment surveillance without a warrant, has not changed just because the mechanism we use for engaging in this conduct has evolved.
As for documents that we store in the Cloud, our privacy interest there is- the same as that recognized in documents and other items maintained in a rented office or residence, or a hotel room during a paid visit. As discussed previously, the Supreme Court has plainly recognized as reasonable under the Fourth Amendment the privacy interest in effects held in such places, even though a straight-forward application of the third-party doctrine would suggest the opposite conclusion, particularly in the case of a hotel room, where housekeeping and maintenance workers can be expected to enter the premises. The privacy expectation has not abraded simply because the effect to be searched is virtual and the “place” of storage is now the intangible Cloud. Cf. Riley v. California, — U.S.-, 134 S.Ct. 2473, 2494-95, 189 L.Ed.2d 430 (2014) (recognizing that searches of cell phones implicate the same type of privacy interest invaded by the “reviled ‘general warrants’ and ‘writs of assistance’ of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity,” and holding that a warrant is generally required to search a cell phone in an arrestee’s possession at the time of arrest, despite the historical rule allowing for a search of effects on an arrestee at the time of arrest). “For the Fourth Amendment protects people, not places.” Katz, 389 U.S. at 351, 88 S.Ct. at 511.
C.
And Justice Alito’s concurrence in Jones, 132 S.Ct. at 964 (Alito, J., concurring in the judgment), suggests a viable and apt historical privacy interest that pertains to global-positioning system information: the expectation of privacy as it regards incessant surveillance. Justice Alito has described this expectation of privacy as follows:
[Relatively short-term monitoring of a person’s movements on public streets accords with expectations of privacy that our society has recognized as reasonable____ But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society’s expectation has been that law enforcement agents and others would not — and indeed, in the main, simply could not— secretly monitor and catalogue every single movement of an individual’s car for a very long period.

Id.

Three other Justices joined in Justice Alito’s Jones concurrence, and another, Justice Sotomayor, expressed her agreement with the idea that, “at the very least, ‘longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.’ ” Id. at 955 (Sotomayor, J., concurring) (quoting id. at 964 (Alito, J., concurring)). While this view may not constitute binding Supreme Court precedent, it certainly suggests that society has long viewed as reasonable the expectation of privacy in not being subjected to constant, longer-term surveillance. And if that’s the case, the only question that remains about whether the government must obtain a warrant to engage in longer-term GPS monitoring is where we draw the line establishing what constitutes “longer-term” GPS monitoring. But that is not a question that we must answer today.
Nevertheless, in my opinion, the longer-term GPS issue necessarily means that the Dissent is correct in its concerns that the expectation of privacy that is infringed by longer-term GPS monitoring may, at some *531 point, become the same expectation of privacy implicated by more and more precise cell-site location technology. When that happens, the historical reasonable expectation of privacy in not being subjected to longer-term surveillance may well supersede the third-party doctrine’s applicability to information entrusted to third parties as it pertains to cell-site location information.[6] But that is not this case.
According to the MetroPCS records custodian who testified in this case, the radii of the cell towers at issue were approximately a mile to a mile and a half. Since a sector is generally a one-third to a one-sixth pie slice of the roughly circular tower range, that means that, at best, the government was able to determine where Davis was within approximately 14,589,696 square feet.[7] In an urban environment, this is . not precise enough to rival the invasion of privacy that pinpoint-longer-term surveillance represents.
Since no specific historical privacy interest is implicated by cell-site location information, and further, because the privacy interest in the cell-site location information at issue here is materially indistinguishable from the privacy interest in the pen-register information at stake in Smith[8] we must apply the third-party doctrine, as the Supreme Court did in Smith. I read Smith, in turn, as implicitly finding no historical privacy interest implicated by information provided to the telephone company to allow a call to be made, other than the general third-party doctrine.[9] Because no specific historical privacy interest is implicated by pen-register-type informa *532 tion, the more general historical privacy-expectation associated with the third-party doctrine governed in Smith. The same is true with respect to the cell-site location information at issue in this case.
III.
Nevertheless, where, as here, no historical privacy interest exists in the information sought, Congress always has the option of legislating higher standards for the government to obtain information. Justice Alito has opined, “In circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative.” Jones, 132 S.Ct. at 964 (Alito, J., concurring in the judgment). This is certainly one potential limitation on the third-party doctrine. And we have seen Congress enact legislation in response to the application of the third-party doctrine to our modern world. See, e.g., the Right to Financial Privacy Act, 12 U.S.C. § 2701, et seq.[10] Indeed, the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510, et seq., of which the Stored Communications Act, 18 U.S.C. §§ 2701-2712, is a part — the statute under which the government obtained the order authorizing it to receive Davis’s historical cell-site location information in this ease — was enacted (and later amended), in part, to protect what Congress recognized as “privacy interests in personal and proprietary information” that travels and is maintained in electronic form by third-party service providers. See H.R.Rep. No. 99-541 at § I (1986).
But legislation should fill only the gaps that occur when no historically recognized privacy interest is implicated by the technology under review. The legislature, after all, does not have the power to entirely redefine the protections of the Fourth Amendment each time that it enacts a new law. While providing more protection than the Fourth Amendment requires represents a choice that Congress may, within its power, make, providing less is not a constitutional option. If it were, the Fourth Amendment would be meaningless because it would simply be whatever Congress said it was at any given time.
That cannot be right under our Constitution. So Congress’s ability to legislate reasonable expectations of privacy (other than when Congress elects to increase expectations above the Fourth Amendment baseline) must be limited to, at most, only those circumstances where no historical privacy interest implicated by the technology under review exists.
IV.
For all of these reasons, I believe that Smith (and therefore, the third-party doctrine) inescapably governs the outcome of this case. But when we must necessarily expose information to third-party technological service providers in order to make use of everyday technology, and the technological service merely allows us to engage in an activity that historically enjoyed a constitutionally protected privacy interest, Supreme Court precedent can be viewed as supporting the notion that the historically protected privacy interest must trump the third-party doctrine for purposes of Fourth Amendment analysis. If the historically protected privacy interest does not, then with every new technology, we surrender more and more of our histor *533 ically protected Fourth Amendment interests to unreasonable searches and seizures.
MARTIN, Circuit Judge, dissenting,[1] in which JILL PRYOR, Circuit Judge, joins:
In this case, the government got 67 days of cell site location data disclosing Quartavious Davis’s location every time he made or received a call on his cell phone. It got all this without obtaining a warrant. During that time, Mr. Davis made or received 5,803 phone calls, so the prosecution had 11,606 data points about Mr. Davis’s location. We are asked to decide whether the government’s actions violated Mr. Davis’s Fourth Amendment rights. The majority says our analysis is dictated by the third-party doctrine, a rule the Supreme Court developed almost forty years ago in the context of bank records and telephone numbers. But such an expansive application of the third-party doctrine would allow the government warrantless access not only to where we are at any given time, but also to whom we send e-mails, our search-engine histories, our online dating and shopping records, and by logical extension, our entire online personas.
Decades ago, the Supreme Court observed that “[i]f times have changed, reducing everyman’s scope to do as he pleases in an urban and industrial world, ... the values served by the Fourth Amendment [are] more, not less, important.” Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). This is even truer today. The judiciary must not allow the ubiquity of technology — which threatens to cause greater and greater intrusions into our private lives — to erode our constitutional protections. With that in mind, and given the striking scope of the search in this case, I would -hold that the Fourth Amendment requires the government to get a warrant before accessing 67 days of the near-constant cell site location data transmitted from Mr. Davis’s phone. ’ I respectfully dissent.
I.
I turn first to the third-party doctrine, which the majority believes decides this case for us. They say: “Davis can assert neither ownership nor possession of the third-party’s business records he sought to suppress.” Maj. Op. 511; see also William Pryor Concurrence 519 {“Smith controls this appeal.”). My reading of Supreme Court precedent suggests that things are not so simple.
The Supreme Court announced' the third-party doctrine nearly forty years ago in United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The Court said that “the Fourth Amendment does not prohibit the obtaining of informa *534 tion revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.” Id. at 443, 96 S.Ct. at 1624. Three years later, in Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the Court applied that doctrine to hold that a defendant did not have a reasonable expectation of privacy in the numbers he dialed on his home telephone, recorded by means of a pen register at a telephone company’s central office. Id. at 742, 99 S.Ct. at 2581. The Court reasoned that “[w]hen he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and ‘exposed’ that information to its equipment in the ordinary course of business.” Id. at 744, 99 S.Ct. at 2582. The Court reminisced that “[t]he switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber.” Id. The government believes that Smith controls the outcome of this case, and the majority apparently agrees. I do not.
First, the phone numbers a person dials are readily distinguishable from cell site location data. Smith involved “voluntarily conveyed numerical information” — voluntary because phone dialers have to affirmatively enter the telephone number they are dialing in order to place a call. By contrast, cell phone users do not affirmatively enter their location in order to make a call. Beyond that, the ACLU informs us that “[pjhones communicate with the wireless network when a subscriber makes or receives calls.” ACLU Amicus Br. 5 (emphasis added). As our sister Circuit observed, “when a cell phone user receives a call, he hasn’t voluntarily exposed anything at all.” In re Application of U.S. for an Order Directing a Provider of Elec. Commc’n Serv. to Disclose Records to the Gov’t, 620 F.3d 304, 317-18 (3d Cir.2010) {Third Circuit Case) .(emphasis added) (quotation marks omitted).[2]
The Smith Court also emphasized that the numbers a person dials appear on the person’s telephone bill and referenced the pre-automation process that required the caller to recite phone numbers out loud to a phone operator in order to make a call. Thus, the Court concluded that “[telephone users ... typically know that they must convey numerical information to the phone company.” Smith, 442 U.S. at 743, 99 S.Ct. at 2581 (emphasis added). There is not the same sort of “knowing” disclosure of cell site location data to phone companies because there is no history of *535 cell phone users having to affirmatively disclose their location to an operator in order to make a call. The extent of voluntariness of disclosure by a user is simply lower for cell site location data than for the telephone numbers a person dials. For that reason, I don’t think Smith controls this case.
Second, although the Müler/Smith rule appears on its own to allow government access to all information that any third-party obtains, in rulings both before and since those cases, the Supreme Court has given reasons to doubt the rule’s breadth. For instance, in Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), the Court stated that “[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent.” Id. at 78, 121 S.Ct. at 1288. Though the majority did not mention the third-party doctrine, Justice Scalia noted the incongruity between that doctrine and the Ferguson holding in his dissent. As he stated:
Until today, we have never held — or even suggested — that material which a person voluntarily entrusts to someone else cannot be given by that person to the police, and used for whatever evidence it may contain. Without so much as discussing the point, the Court today opens a hole in our Fourth Amendment jurisprudence, the size and shape of which is entirely indeterminate.
Id. at 95-96, 121 S.Ct. at 1297-98 (Scalia, J., dissenting). -Further, and again without mentioning the third-party doctrine, the Court has routinely recognized that people retain a reasonable expectation of privacy in things that they have arguably exposed to third parties. See, e.g., United States v. Jacobsen, 466 U.S. 109, 114, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984) (holding that “[ljetters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy” even though they touch the hands of third-party mail carriers); Stoner v. California, 376 U.S. 483, 487-88, 490, 84 S.Ct. 889, 892, 893, 11 L.Ed.2d 856 (1964) (finding unpersuasive the argument that “the search of [a] hotel room, although conducted without the petitioner’s consent, was lawful because it was conducted with the consent of the hotel clerk,” because a hotel guest’s constitutional protections should not be “left to depend on the unfettered discretion of an employee of the hotel”); see also Smith, 442 U.S. at 746-47, 99 S.Ct. at 2583 (Stewart, J., dissenting) (noting that in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court held that a person has a reasonable expectation of privacy in the contents of phone conversations made in telephone booths even though calls “may be recorded or overheard by the use of other company equipment”). I am well aware that each of these cases can be distinguished from Mr. Davis’s case. I mean only to say that a comprehensive review of Supreme Court precedent reveals that the third-party doctrine may not be as all-encompassing as the majority seems to believe.
Third and most importantly, the majority’s blunt application of the third-party doctrine threatens to allow the government access to a staggering amount of information that surely must be protected under the Fourth Amendment. Consider the information that Google gets from users of its e-mail and online search functions.[3] *536 According to its website, Google collects information about you (name, e-mail address, telephone number, and credit card data); the things you do online (what videos you watch, what websites you access, and how you view and interact with advertisements); the devices you use (which particular phone or computer you are searching on); and your actual location. See Privacy Policy, http://www.google.com/ intl/en/policies/privacy/ (last accessed March 30, 2015). Beyond that, in its “Terms of Service,” Google specifies that “[w]hen you upload, submit, store, send or receive content to or through our Services, you give Google (and those we work with) a worldwide license to use, host, store, reproduce, modify, create derivative works, ... communicate, publish, publicly perform, publicly display and distribute such content.” See Google Terms of Service, http://www.google.com/intl/en/policies/ terms/ (last accessed March 30, 2015). Like in Miller and Smith, Google even offers a legitimate business purpose for such data storage and mining: “Our automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection.” Id. Under a plain reading of the majority’s rule, by allowing a third-party company access to our e-mail accounts, the websites we visit, and our search-engine history— all for legitimate business purposes — we give up any privacy interest in that information.
And why stop there? Nearly every website collects information about what we do when we visit. So now, under the majority’s rule, the Fourth Amendment allows the government to know from YouTube.com what we watch, or Face-book.com what we post or whom we “friend,” or Amazon.com what we buy, or Wikipedia.com what we research, ■ or Match.com whom we date — all without a warrant. In fact, the government could ask “cloud”-based file-sharing services like Dropbox or Apple’s iCloud for all the files we relinquish to their servers. I am convinced that most internet users would be shocked by this. But as far as I can tell, every argument the government makes in its brief regarding cell site location data applies equally well to e-mail accounts, search-engine histories, shopping-site purchases, cloud-storage files, and the like. See, e.g., Appellee’s Br. 21-22 (“Davis can assert neither ownership nor possession of the third-party records he sought to suppress.”); id. at 22 (“Evidence lawfully in the possession of a third party is not his, even if it has to do with him.”); id. at 23 (“Davis is not in a good position to complain that the government improperly obtained ‘his location data,’ since he himself exposed and revealed to MetroPCS the very information he now seeks to keep private.”); id. at 24 (“It is not persuasive to argue that phone users do not knowingly or intentionally disclose any location-related information to their service providers.”); id. at 25 (“For purposes of the Fourth Amendment, it makes no difference whether Davis knew that MetroPCS was collecting location-related information.”); id. at 27-28 (“[Sjervice contracts and privacy policies typically warn cellphone customers that phone companies collect location-related information and may disclose such data to law-enforcement authorities.”).
The enormous impact of this outcome is probably why at least one Circuit has held that a person’s Fourth Amendment rights are violated when the government compels an internet service provider to turn over the contents of e-mails without a warrant. See United States v. Warshak 631 F.3d 266, 286-88 (6th Cir.2010). Surely the majority would agree and would also shield e *537 mails from government snooping absent a warrant. But if e-mails are protected despite the fact that we have surrendered control of them to a third party, then the rule from Smith and Miller has its limits.
The majority suggests that e-mails can be distinguished because cell site location data is “non-content evidence.” Maj. Op. 511 (emphasis omitted). The majority offers no coherent definition of the terms “content” and “non-content,” and I am hard-pressed to come up with one. For instance, would a person’s Google search history be content or non-content information? Though a person’s search terms may seem like “content,” a search term exists in the web address generated by a search engine.[4] And web addresses, like phone numbers, seem like quintessentially non-content information that merely direct a communication. But regardless, although this content-non-content distinction could — maybe—shield the body of e-mail messages, the government may presumably still access the time and date that we send e-mails, the names of the people who receive them, and the names of the people who email us, without a warrant. Likewise, although our actual activities on a dating or shopping website might be protected, the fact that we visited those websites or any other would still be freely discoverable. The government agreed at oral argument that under its theory, it could at the very least obtain records like the sender and receiver of e-mails, the time of day e-mails are sent, the number of e-mails a person sends, the websites that a person visits, and maybe even the connections a person communicates with on a dating website and whom she meets in person — all without a warrant.
This slippery slope that would result from a wooden application of the third-party doctrine is a perfect example of why the Supreme Court has insisted that technological change sometimes requires us to consider the scope of decades-old Fourth Amendment rules. See Kyllo v. United States, 533 U.S. 27, 35, 121 S.Ct. 2038, 2044, 150 L.Ed.2d 94 (2001) (rejecting a “mechanical interpretation of the Fourth Amendment” in the face of “advancing technology”); cf. Katz, 389 U.S. at 353, 88 S.Ct. at 512 (“To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.”). For instance, in Riley v. California, 573 U.S.-, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014), the Court was asked to decide whether the decades-old search-incident-to-arrest exception to the warrant requirement applied to cell phones on an arrestee’s person. Id. at 2480. California argued that the Court’s 41-year-old decision in United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), controlled the outcome in Riley because the Court held that a search of objects on an arrestee’s person was categorically reasonable. See Riley, 134 S.Ct. at 2491. The Riley Court agreed that “a mechanical application of Robinson might well support the warrant-less searches at issue.” Id. at 2484. But it nonetheless unanimously rejected that argument, saying that cell “phones are based on technology nearly inconceivable just a few decades ago, when ... Robinson w[as] decided.” Id. Thus, to say that a search of cell phone data is “materially indistinguishable” from a search of physical items
is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together. Mod *538 ern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or á purse.
Id. at 2488-89.
Likewise here, the extent of information that we expose to third parties has increased by orders of magnitude since the Supreme Court decided Miller and Smith. Those forty years have seen not just the proliferation of cell phones .that can be tracked, but also the' advent of the internet. Given these extraordinary technological advances, I believe the Supreme Court requires us to critically evaluate how far to extend the third-party doctrine. As Justice Sotomayor observed:
[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.... I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.
United States v. Jones, 565 U.S. -, -, 132 S.Ct. 945, 957, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring) (citations omitted). Neither would I assume as much. Though the doctrine may allow the government access to some information that we disclose to third parties, I would draw the line short of the search at issue here. Sixty-seven days of near-constant location tracking of a cell phone — a technological feat impossible to imagine when Miller and Smith were decided — -is an application of the doctrine that goes too far.
II.
Because I believe that the third-party doctrine does not dictate the outcome of this case, I turn to fundamental Fourth Amendment principles. The Fourth Amendment says:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV. “As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness.” Riley, ■ 134 S.Ct. at 2482 (quotation marks omitted). Our analysis is two-fold: “First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private.” Bond v. United States, 529 U.S. 334, 338, 120 S.Ct. 1462, 1465, 146 L.Ed.2d 365 (2000) (quotation omitted) (alteration adopted). “Second, we inquire whether the individual’s expectation of privacy is one that society is prepared to recognize as reasonable.” Id. (quotation omitted). If we conclude that a particular search violates a defendant’s reasonable expectation of privacy, the government must get a search warrant.
For me, the answer to the subjective inquiry is easy. It seems obvious that Mr. Davis never intended to disclose his location to the government every time he made or received calls. Recent polling data tells us that 82% of adults “feel as though the details of their physical location gathered over a period of time” is “very sensitive” or “somewhat sensitive.” Mary Madden, Public Perceptions of Privacy and Security in the Post-Snowden Era 34, Pew *539 Research Center (Nov. 12, 2014), http:// www.pewinternet.org/files/2014/ll/PI_ PubliePereeptionsofPrivacy_111214.pdf. This .supports the common-sense notion that people do not expect the government to track them simply as a consequence of owning and using what amounts to a basic necessity of twenty-first century life — the cell phone.[5] Beyond that, the prosecutor in this case specifically admitted at closing argument that “what this defendant could not have knoum was that ... his cell phone was 'tracking his every moment.” Trial Tr. 4-5, Feb. 8, 2012, ECF No. 287 (emphasis added); see also id. at 14 (arguing that Mr. Davis and his co-conspirators “had no idea -that by bringing their cell phones with them to these robberies they were allowing MetroPCS and now [the jury] to follow their movements”). In short, I believe that Mr. Davis — like any other person interacting in today’s digital world — quite reasonably had a subjective expectation that his movements about town would be kept private.[6]
The more important and more difficult question we must consider is whether Mr. Davis’s expectation of privacy is one society is objectively prepared to recognize as reasonable. I believe the answer is yes. The Supreme Court recently reminded us that “there is an element of pervasiveness that characterizes cell phones.” Riley, 134 S.Ct. at 2490. ' Today, “it is the person who is not carrying a cell phone ... who is the exception.” Id. The Court noted that “nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower.” Id. (quoting Harris Interactive, 2013 Mobile Consumer Habits Study (June 2013)). In other words, “modern cell phones ... are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy.” Id. at 2484; see also City of Ontario, Cal. v. Quon, 560 U.S. 746, 760, 130 5.Ct. 2619, 2630, 177 L.Ed.2d 216 (2010) (“Cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identification.”).
Since we constantly carry our cell phones, and since they can be used to track our movements, the recent opinions of five Justices in United States v. Jones that long-term location-monitoring generally violates expectations of privacy are instructive. In Jones, the Supreme Court *540 considered whether warrantless monitoring of the location of a person’s car for twenty-eight days by means of a GPS tracker violated the defendant’s rights under the Fourth Amendment. 132 S.Ct. at 948^49. All nine Justices said yes. Five Justices held that such tracking violated the Fourth Amendment under a trespass theory that considered the government’s physical intrusion of the ear. Id. at 949. Important for Mr. Davis’s case, however, a different set of five Justices were in agreement that “longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.” Id. at 955 (Soto-mayor, J., concurring) (quoting id. at 964 (Alito,- J., joined by Ginsburg, Breyer, and Kagan, JJ., concurring in the judgment)). Said one Justice, “GPS monitoring generates a precise, comprehensive record of a person’s public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.” Id. at 955 (Sotomayor, J., concurring). Said four other Justices, “society’s expectation has been that law enforcement agents and others would not — and indeed, in the main, simply could not — secretly monitor and catalogue every single movement of an individual’s car for a very long period.” Id. at 964 (Alito, J., concurring in the judgment).[7]
The search at'issue here similarly impinged on expectations of privacy. The location data the government collected, though not quite as precise as the GPS data in Jones, still revealed Mr. Davis’s comings and goings around Miami with an unnerving level of specificity. Each time he made or received a call, MetroPCS catalogued the cell tower to which his cell phone connected, typically the “[njearest and strongest” tower. Trial Tr. 221, Feb. 6, 2012, EOF No. 283. In a “cosmopolitan area [like] Miami,” there are “many, many towers” whose coverage radii are “much smaller” than a “mile-and-a-half.” Id. at 222-23. Each coverage circle is further subdivided into “three or six portions.” Id. at 222. The data the government obtained in this case specified the' sector within a tower’s coverage radius in which Mr. Davis made or received a call.
The amount of data the government got is also alarming. The government demanded from MetroPCS sixty-seven days of cell site location data- — more than double the time at issue in Jones. In total, this data included 5,803 separate call records. Since MetroPCS cataloged the cell tower sector where each phone call started and ended, the government had 11,606 cell site location data points. This averages around one location data point every five and one half minutes for those sixty-seven days, assuming Mr. Davis slept eight hours a night.
The amount and type of data at issue revealed so much information about Mr. Davis’s day-to-day life that most of us would consider quintessentially private. For instance, on August 13, 2010, Mr. Davis made or received 108 calls in 22 unique cell site sectors, showing his movements throughout Miami during that day. And the record reflects that many phone calls began within one cell site sector and ended in another, exposing his movements even during the course of a single phone call.
Also, by focusing on the first and last calls in a day, law enforcement could determine from the location data where Mr. Davis lived, where he slept, and whether those two locations were the same. As a *541 government witness testified at trial, “if you look at the majority of ... calls over a period of time when somebody wakes up and when somebody goes to sleep, normally it is fairly simple to decipher where their home tower would be.” Trial Tr. 42, Feb. 7, 2012, EOF No. 285. For example, from August 2, 2010, to August 31, 2010, Mr. Davis’s first and last call of the day were either or both placed from a single sector — purportedly his home sector. But on the night of September 2, 2010, Mr. Davis made calls at 11:41pm, 6:52am, and 10:56am — all from a location that was not his home sector. Just as Justice Sotomayor warned, Mr. Davis’s “movements [were] recorded and aggregated in a manner that enable[d] the Government to ascertain, more or less at will, ... [his] sexual habits, and so on.” Jones, 132 S.Ct. at 956 (Sotomayor, J., concurring); see also United States v. Maynard, 615 F.3d 544, 562 (D.C.Cir.2010) (“A person who knows all of another’s travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband,' an outpatient receiving medical treatment, an associate of particular individuals or political groups — and not just one such fact about a person, but all such facts.”).
Importantly, the specificity of the information that the government obtained was highlighted by the way the government used it at trial. The government relied upon the information it got from MetroPCS to specifically pin Mr. Davis’s location at a particular site in Miami. See, e.g., Trial Tr. 58, Feb. 7, 2012, ECF No. 285 (noting that “Mr. Davis’s phone [was] literally right up against the America Gas Station immediately preceding and after [the] robbery occurred”); id. at 61 (noting “the presence of his cell phone literally ... right next door to the' Walgreen’s just before and just after that store was robbed”). On this record, Mr. Davis had a reasonable expectation of privacy in the cell site location data the government obtained, and his expectation was one that society should consider reasonable. I would therefore hold that absent a warrant, a Fourth Amendment violation occurred.
III.
The majority, of course, believes that Mr. Davis had no reasonable expectation of privacy in the cell site location data obtained in his case. It emphasizes the large size of the sectors that each location data point revealed as evidence that the privacy intrusion was not so great. See Maj. Op. 501-02, 503-04. It also says we need not consider more invasive technologies that have developed since the search that took place here. Id. at 504 n. 7 (“There is no evidence, or even any allegation, that the MetroPCS network reflected in the records included anything other than traditional cell towers and the facts of this case do not require, or warrant, speculation as to the newer technology.”). Yet the Supreme Court has cautioned us that “[w]hile the technology used in the present case [may be] relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development.” Kyllo, 533 U.S. at 36, 121 S.Ct. at 2044. Just as the majority appropriates decades-old precedent from Miller and Smith and applies it to new technologies, the rule we make today necessarily will apply to everyone else’s case going forward.
That future impact is troubling. As technology advances, the specificity of cell site location information has increased. Cell phone companies are constantly upgrading their networks with more and more towers. As the ACLU explains:
*542 Cell site density is increasing rapidly, largely as a result of the growth of internet usage by smartphones----As new cell sites are erected, the coverage areas around existing nearby cell sites will be reduced, so that the signals sent by those sites do not interfere with each other. In addition to erecting new conventional cell sites, providers are also increasing their network coverage using low-power small cells, called “micro-cells,” “picocells,” and “femtocells” (collectively, “femtocells”), which provide service to areas as small as ten meters .... Because the coverage area of femtocells is so small, callers connecting to a carrier’s network via femtocells can be located to a high degree of precision, sometimes effectively identifying individual floors and rooms within buildings.
ACLU Amicus Br. 7-8 (quotations, citations omitted); see also id. at 7 (noting that “the number of cell sites in the United States has approximately doubled in the last decade”); id. at 8 (noting that “[f]emtocells with ranges extending outside of the building in which they are located can also provide cell connections to passersby, providing highly precise information about location and movement on public streets and sidewalks”). The location features on smartphones are even more precise. See Riley, 134 S.Ct. at 2490 (“Historic location information is a standard feature on many smart phones and can reconstruct someone’s specific movements down to the minute, not only around town but also within a particular building.”).
Beyond that, today, the vast majority of communications from cell phones are in the form of text messages and data transfers, not phone calls. The frequency of text messaging is much greater than the frequency of phone calling — particularly among young cell phone users. See Amanda Lenhart, Teens, Smartphones & Texting (available at http://www.pew internet.org/2012/03/19/teens-smartphones-texting/) (finding that the median number of texts sent per- day by teens ages 12 to 17 rose from 50 in 2009 to 60 in 2011). Also, “smartphones, which are now used by more than six in ten Americans, communicate even more frequently with the carrier’s network, because they typically check for new email messages or other data every few minutes.” ACLU Amicus Br. 5 (citations omitted). Each of these new types of communications can generate cell site location data. See, e.g., United States v. Cooper, No. 13-cr-00693-SI-l, 2015 WL 881578, at *8 n. 6 (N.D.Cal. Mar. 2, 2015) (noting the government’s admission that “cell site data is recorded for both calls and text messages”).
Finally, not only are cell sites fast growing in number, but the typical user has no idea how precise cell site location data is at any given location. As a person walks around town, particularly a dense, urban environment, her cell phone continuously and without notice to her connects with towers, antennas, microcells, and femtocells that reveal her location information with differing levels of precision — to the nearest mile, or the nearest block, or the nearest foot. And since a text or phone call could come in at any second — without any affirmative act by a cell phone user — a user has no control over the extent of location information she reveals.
The government tells us these technological advances do not change our analysis. At oral argument, it admitted that its theory requires us to hold that it could obtain location data without a warrant even when technology someday allows it to know a person’s location to within six inches, and when tracking is continuous and does not require making or receiving a phone call. I reject a theory that allows the government such expansive access to *543 information about where we are located, no matter how detailed a picture of our movements the government may receive.
But we need not fear the threat of increasing precision of location information, says the majority. At the same time it suggests that today’s ruling might not apply to future technology, however, the majority’s opinion offers absolutely no guidance to the judges who authorize searches of cell site location data and the officers who conduct them. As the ACLU pointed out, “[a]gents will not have prior knowledge of whether the surveillance target was in a rural area with sparse cell sites, an urban area with dense cell sites or six-sector antennas, or a home, doctor’s office, or church with femtocells.” ACLU Amicus Br. 9. Thus, a judge will authorize a search of a person’s cell site location data for a certain period of time without knowing how precise the location information will be. While I admire the majority’s attempt to cabin its holding to, the technology of five years ago, its assurances in this regard seem naive in practice. As a result of today’s decision, I have little doubt that all government requests for cell site location data will be approved, no matter how specific or invasive the technology.
TV.
The majority offers dire warnings of the consequences ■ of restricting the government’s access to cell site location data, suggesting that without it, all manner of horrific crimes — from child abductions to terrorism — would go uninvestigated. See Maj. Op. 517. But if my view of the Fourth Amendment were to prevail, all the officers in this case had to do was get a warrant for this search. That is no great burden. “Under the Fourth Amendment, an officer may not properly issue a warrant ... unless he can find probable cause therefor from facts or circumstances presented to him under oath or affirmation.” Nathanson v. United States, 290 U.S. 41, 47, 54 S.Ct. 11, 13, 78 L.Ed. 159 (1933). The probable-cause standard is not onerous. See Illinois v. Gates, 462 U.S. 213, 291, 103 S.Ct. 2317, 2360, 76 L.Ed.2d 527 (1983) (Brennan, J., dissenting) (criticizing a probable-cause standard that “imposes no structure on magistrates’ probable cause inquiries ... and invites the possibility that intrusions may be justified on less than reliable information from an honest or credible person”); Ricardo J. Bascuas, Property and Probable Cause: The Fourth Amendment’s Principled Protection of Privacy, 60 Rutgers L.Rev. 575, 592-93 (2008) (“The Supreme Court has set the standard for the quality of information that can support a warrant so low that judges can hardly be expected to uncover a baseless request.”); cf Riley, 134 S.Ct. at 2493 (noting that “[r]ecent technological advances ... have ... made the process of obtaining a warrant itself more efficient”). Nor is cell site data the type of information which would spoil or perish during the short time it takes to get a warrant. Finally, requiring a warrant would not do away with the other well-established exceptions to the warrant requirement, like exigent circumstances. Cf. Riley, 134 S.Ct. at 2494 (noting that “the availability of the exigent circumstances exception ... address[es] some of the more extreme hypothetieals that have been suggested”). Imposing the requirement for a warrant under these circumstances would hardly shackle law enforcement from conducting effective investigations.
But regardless of how easy it might be to get warrants, the Supreme Court has reminded us time and again of how important they are.
The warrant requirement has been a valued part of our constitutional law for decades, and it has determined the re- *544 suit in scores and scores of eases in courts all over this country. It is not an inconvenience to be somehow ‘weighed’ against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the ‘well-intentioned but mistakenly over-zealous, executive officers’ who are a part of any system of law enforcement.
Coolidge, 403 U.S. at 481, 91 S.Ct. at 2046 (citation omitted). The majority emphasizes that the Stored Communications Act (SCA) requires the government to “offer[ ] specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.” 18 U.S.C. § 2703(d). But it does not contest — nor could it — that this standard falls below the probable-cause standard that courts usually demand. See Maj. Op. 505.[8]
Once again, the Supreme Court’s analysis in Riley is instructive.[9] There, the Court recognized:
We cannot deny that our decision today will have an impact on the ability of law enforcement to combat crime. Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals. Privacy comes at a cost.
Riley, 134 S.Ct. at 2493. But still, the Court insisted that law enforcement officers get a warrant before searching a cell phone incident to arrest. So too here. I would simply require the government do what it has done for decades when it seeks to intrude upon a reasonable expectation of privacy. That is, “get a warrant.” Id. at 2495.
V.
The majority proclaims that its holding today is “narrow[ ],” Maj. Op. 505, limited only to cell site location data, and only to the kind of data the government could obtain in 2010. But “[sjteps innocently taken may one by one lead to the irretrievable impairment of substantial liberties.” Glasser v. United States, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680 (1942). Under the reasoning employed by the majority, the third-party doctrine may well permit the government access to our precise location at any moment, and in the end, our entire digital lives. And although Mr. Davis — as the majority reminds us in great detail, see Maj. Op. 500-01 — has been convicted of very serious crimes and is not therefore the most sympathetic bearer of this message,[10] “the rule[s] we -fashion [are] for the innocent and guilty alike.” Draper v. United States, 358 U.S. 307, 314, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (Douglas, J., dissenting). I would not subject the citizenry to constant location tracking of their cell phones without requiring the government to get a war *545 rant. The Fourth Amendment compels this result. I respectfully dissent.

. The third-party doctrine applies when a person voluntarily entrusts information to a third party, and it generally renders the Fourth Amendment's warrant requirement inapplicable as it pertains to the procurement of the exposed information from the third party. See United States v. Miller, 425 U.S. 435, 442-43, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976).

. Some might suggest that we must first determine whether a search within the meaning *526 of the Fourth Amendment has occurred, and only if one has should we then assess whether that search has violated a constitutionally protected expectation of privacy, in the context of engaging in a reasonableness analysis. But generally, when the alleged search is of information and it is not accompanied by a concurrent physical trespass, we must evaluate whether a reasonable expectation of privacy existed in the information in the first place in order to determine whether a ‘‘search” has occurred. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Smith, 442 U.S. 735, 99 S.Ct. 2577. That inquiry requires us to resolve the conflict between the historical expectation of privacy allegedly violated by the search and the third-party doctrine's rule that no expectation of privacy exists when a person voluntarily exposes information to a third party. And under the reasonableness analysis, we balance the degree to which a search or seizure ‘‘intrudes upon an individual’s privacy” against "the degree to which it is needed for the promotion of legitimate' governmental interests.” Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408 (1999). So we would again need to figure out the relationship between the competing historical expectation of privacy and the third-party doctrine to determine the ultimate expectation of privacy to weigh against the government's interest. As a result, this two-step analysis becomes redundant in the context of an alleged search of information without a concurrent physical trespass.
Moreover, if, in conducting the reasonableness analysis, we ignore the historical privacy interest and always defer to the third-party doctrine, that does not account for the way in which the Supreme Court has resolved the conflict between the historical privacy interest and the third-party doctrine in cases like Katz, 389 U.S. 347, 88 S.Ct. 507, because ignoring the historical privacy interest in favor of the third-party doctrine would always result in a determination that no warrant is required under a reasonableness evaluation. This is necessarily so because when the third-party doctrine applies, by definition, there is no reasonable privacy interest to weigh on the individual's side of the scale against the government's interest in crime fighting. But “the normal need for law enforcement” generally cannot exempt a search from the warrant requirement where the searched party enjoys a reasonable expectation of privacy, Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995), such as when the privacy interest at stake has historically been recognized-unless, of course, it is impracticable to obtain a warrant under the circumstances. See, e.g., Terry v. Ohio, ,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (Í967). And if we resolved the conflict between the historically existing privacy interest and the third-party doctrine by assuming a diminished expectation of privacy in the historical interest being weighed against the government's general interest in crime fighting, that still would not seem to account for cases like Katz, 389 U.S. 347, 88 S.Ct. 507, even if the Court found that satisfying a lesser requirement than probable cause, such as that set forth by § 2703(d), was necessary to obtain the information. Indeed, I am aware of no case where the Court has expressly found an expectation of privacy diminished because of the third-party doctrine and yet has concluded that a warrant was required. But cf. Riley v. California, - U.S.-, 134 S.Ct. 2473, 2488, 189 L.Ed.2d 430 (2014) (holding that a warrant is generally required to search an arrestee’s cell phone, even though arrestees have a diminished expectation of privacy because of their status as arrestees). Whether we ignored the more specific historical privacy interest in favor of the third-party doctrine or found that the historical privacy interest was diminished, though, privacy interests long recognized as reasonable by society, which therefore historically necessitated a showing of probable cause and a warrant under the Fourth Amendment in order to breach, would be violated without a warrant and on a showing of less than probable cause, simply because we happen to use technology to do more efficiently what we used to do without technology. I do not believe that Supreme Court precedent supports the conclusion that the long-established privacy interests protected by the Fourth Amendment should be subject to the whims of technology. See Kyllo, 533 U.S. at 34, 121 S.Ct. at 2043 (2001) (“To withdraw protection of this minimum expectation [of privacy] would be to permit ... technology to erode the privacy guaranteed by the Fourth Amendment.”). And even if the Court were prepared to conclude that a privacy interest diminished- by the third-party doctrine nonetheless required a warrant to breach, it would still need to articulate why one particular expectation of privacy diminished by the third-party doctrine was sufficient to outweigh the government's general interest in crime fighting, while a different *527 expectation of privacy diminished by the third-party doctrine was not, unless the more specific historical expectation of privacy negates the effects of the third-party doctrine in evaluating the privacy interest for purposes of conducting the reasonableness analysis.

. I recognize that inns existed in the Framers' day.

. Alexander Graham Bell obtained a patent for the telephone on March 7, 1876. See http ://www.pbs. org/transistor/album 1/ addlbios/bellag.html (last visited Apr. 16, 2015). He successfully transmitted speech over the line five days later. Id. But the United States House of Representatives has since recognized Antonio Meucci as the inventor of the telephone. H.R. Res. 269, 107th Cong. (June 11, 2002). Meucci reportedly developed the first version of a working telephone in 1860. See id.

. The Supreme Court has held that addressing and other routing information on paper letters, like pen-register and trap-and-trace information (including the date and time of listed calls) regarding telephone calls, is accessible to the government without a warrant. See Ex parte Jackson, 96 U.S. 727, 736, 24 L.Ed. 877; Smith, 442 U.S. 735, 99 S.Ct. 2577. Email routing information, such as the sender, the receiver, the date, the time, and other routing information (such as Internet Protocol addresses) implicates the same expectations of privacy as older versions of routing information found on paper letters and in pen-register and trap-and-trace information. See United States v. Forrester, 512 F.3d 500, 511 (9th Cir.2007). The lack of a reasonable expectation of privacy in routing information as it pertains to paper letters and telephone conversations does not change just because the medium for engaging in personal conversations does. Subject lines in emails, however, are not in any way related to the routing or transaction information of an email; no one writes the subject matter of the letters they send on the outside of the envelope, and people do not give the telephone service provider a general overview of the telephone conversations they are about to have. So subject-matter lines on emails cannot be governed by the lack of an expectation of privacy attending paper-letter or telephone-call routing information. Instead, subject-matter lines usually disclose a summary or general statement about the content of the email communication itself, and the privacy interest implicated by subject-matter lines is therefore the same as the privacy interest in personal communications conducted by paper letters and telephone calls. As a result, as with the content of paper letters and telephone conversations, a reasonable expectation of privacy exists in the subject-matter lines of emails.

. One other perhaps significant difference between GPS technology and precise cell-site location information also exists: GPS monitoring is constant, whereas cell-site location information is produced only when a cellphone user makes or receives a call. If a person is usually on the cell phone, that may be a distinction without a difference. But if a person is not, that may be a meaningful dissimilarity. We conduct Fourth Amendment jurisprudence "with an eye to the generality of cases.” See Houghton, 526 U.S. at 304, 119 S.Ct. at 1303 (balancing interests under the Fourth Amendment’s reasonableness approach). So that factual issue may require resolution at a future time.

. A one-mile radius (5,280 feet), squared (27,-878^400), times II, equals 87,538,176 square feet, divided by six (one sector), equals 14,-589,696 square feet.

. I respect the Dissent’s thought process in attempting to distinguish the concept of whether cell-phone users know that they are disclosing to their service providers the fact that they are usually located in the range of the nearest cell towers that their cell phones are using when they make and receive calls, from the Supreme Court's conclusion in Smith that standard telephone users know that they are disclosing the telephone numbers that they are calling when they dial. But it seems to me that the average cell-phone user knows that cell phones work only when they are within service range of a cell tower. Advertising campaigns are built on this concept. See, e.g., https://www.youtube.com/ watch?v=OPwPo-IAQ-E (last visited Apr. 13, 2015) ("Can you hear me now?”); https:// www.youtube.com/watch?v=VZPjJI0K7Bk (last visited Apr. 13, 2015) ("There's a map for that”). In Smith, similar to the Dissent here, Justice Marshall argued that the third-party doctrine did not apply, in part, because people do not " ‘typically know' that a phone company monitors call[ ] [information] for internal reasons.” 442 U.S. at 748-49, 99 S.Ct. at 2584-85. Right or wrong, he lost that battle. And, while cell-site location information is certainly not pen-register information and I can understand where the Dissent is coming from, I do not feel comfortable taking the position that the average cell-phone user does not know that he or she is disclosing location information to the cell-service provider.

.iThis makes sense, as the privacy interest in discreet routing information is the same as the privacy interest in address information on letters, which, in turn, has always been subject to the third-party doctrine. See supra at n. 5.

. See H.R.Rep. No. 95-1383 at 9306 (1978), 1978 U.S.C.C.A.N. 9273, 9306 ("The Title is a congressional response to the Supreme Court decision in the United States v. Miller.... The Court did not acknowledge the sensitive nature of [financial records], and instead decided that since the records are the 'property' of the financial institution, the customer has no constitutionally recognizable privacy interest in them.”).

. The majority extensively recounts the Fifth Circuit’s decision in In re Application of the U.S. for Historical Cell Site Data, 724 F.3d 600 (5th Cir.2013), which said that a "cell user ha[s] no subjective expectation of privacy in such business records showing cell tower locations.” Maj. Op. 510. That Fifth Circuit case, of course, does not bind us. And in any event, other courts have held that people do have a reasonable expectation of privacy in cell site location data, whether historical or real-time in nature. The Third Circuit Case, for example, rejected the government’s argument that "no [cell site location data] can implicate constitutional protections because the subscriber has shared its information with a third party....” 620 F.3d at 317. Similarly, the Florida Supreme Court has held that cell phone users have a reasonable expectation of privacy in real-time cell site location data. Tracey v. State, 152 So.3d 504, 526 (Fla.2014). And a recent decision from the Northern District of California addressed the very same question we address here and held that a person has a reasonable expectation of privacy in 60 days of historical cell site location data. United States v. Cooper, No. 13-cr-00693-SI-1, 2015 WL 881578, at *6-8 (N.D.Cal. Mar. 2, 2015). In short, we are faced with persuasive, albeit not binding, authority on both sides of the debate, but none controls the outcome of this case.

. I refer to Google only as an example. The same analysis applies to most other online search engine or e-mail service providers.

. For example, a search of “Eleventh Circuit” on google.com produces the web address: '' https://www. google. com/?gws_rd=ssl#q= eleventh + circuit.

. The government argues that regardless of what people think, "MetroPCS’s current privacy* policy ... advises its wireless customers that the company 'may disclose, without your consent, the approximate location of a wireless device to a governmental entity or law enforcement authority when we are served with lawful process.’ " Appellee Br. 28 (citation omitted). But as another court recently noted, "[t]he fiction that the vast majority of the American population consents to warrant-less government access to the records of a significant share of their movements by 'choosing' to carry a cell phone must be rejected.” In re Application of the U.S. for an Order Authorizing the Release of Historical Cell-Site Info., 809 F.Supp.2d 113, 127 (E.D.N.Y.2011). Regardless, and as the majority acknowledges, the "contract does not appear on this record to have been entered into evidence here,” so "we cannot consider it.” Maj. Op. 510 n. 11.

. The majority does not explain why it believes that "the fact that Davis registered his cell phone under a fictitious alias tends to demonstrate his understanding that such cell tower location information is collected by MetroPCS and may be used to incriminate him.” Maj. Op. 511. Mr. Davis’s use of an alias more naturally evidences his desire not to tie his identity to his phone’s account with MetroPCS. For me, Mr. Davis’s use* of an alias says nothing about his subjective expectation of privacy in his location.

. The majority chides Mr. Davis for "deploying] the concurrences in Jones," Maj. Op. 514, but a lower federal court ignores the opinion of five Justices of the Supreme Court at its own risk.

.Certainly the Stored Communications Act is better than nothing. See Maj. Op. 505 (noting that the SCA “raises the bar from an ordinary subpoena to one with additional privacy protections built in’’). But the mere fact that the Act provides some judicial oversight before the government can get cell site location data does not answer the question whether the government is constitutionally required to have a warrant.

. "[TJhere is dicta and then there is dicta, and then there is Supreme Court dicta.” Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006).

. Though regardless of the outcome of this ere banc appeal, Mr. Davis's convictions will stand and he will remain incarcerated due to the good-faith exception. See supra 'note 1.